UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
TAISHA MIRANDA,

$\qquad$ Plaintiff,

-against-

CAROLYN W. COLVIN, ACTING
COMMISSIONER OF SOCIAL SECURITY,

$\qquad$ Defendant.
-----------------------------------------------------------x

┌─────────────────────────────┐
│ **USDC SDNY** │
│ **DOCUMENT** │
│ **ELECTRONICALLY FILED** │
│ **DOC #:** _____ │
│ **DATE FILED:** _11-6-14_ │
└─────────────────────────────┘

13-cv-03264 (PKC)

MEMORANDUM
AND ORDER

P. KEVIN CASTEL, District Judge.

Plaintiff Taisha Miranda seeks judicial review under 42 U.S.C. § 405(g) of a final

decision of the Commissioner of Social Security (the "Commissioner") that she is not eligible for

Disability Insurance Benefits ("DIB") under Title II of the Social Security Act (the "Act"), 42

U.S.C. § 401 *et seq.*, or Supplemental Security Income ("SSI") under Title XVI of the Act, 42

U.S.C. § 1381 *et seq.*, because she is not disabled within the meaning of the Act. Plaintiff asserts

that the decision of the Administrative Law Judge ("ALJ") was erroneous, not supported by

substantial evidence, and contrary to law.

Plaintiff and defendant have each moved for judgment on the pleadings under

Rule 12(c) of the Federal Rules of Civil Procedure. For the reasons set forth below, the

plaintiff's motion is granted to the extent that the matter is reversed and remanded to the

Commissioner and defendant's motion is denied.

I.      **PROCEDURAL HISTORY**

Plaintiff applied to the Social Security Administration ("SSA") for DIB and SSI

in a formal application dated July 28, 2009, claiming that she was unable to work because of her

disabling condition beginning on October 15, 2008.  (R. 107.)[1]  SSA denied her claims in a letter

dated October 8, 2009.  (R. 48-55.)  Plaintiff then requested a hearing before an ALJ, and she

was notified that the hearing would be held on April 5, 2011.  (R. 56-59.)

       The April 5 session was held before ALJ Lucian A. Vecchio.  (R. 42-45.)

Plaintiff appeared without legal representation.  (*Id.*)  Also present was Dr. Lewis Lorro, a

psychologist, who was prepared to provide expert testimony as to plaintiff's claims and

condition.  (*Id.*)  ALJ Vecchio asked plaintiff if she would prefer to have the hearing adjourned

in order for her to obtain an attorney. (Id.)  Plaintiff answered in the affirmative and the hearing

was closed without testimony having been taken.  (R. 45.)

       On October 19, 2011, a second hearing was held before ALJ Wallace

Tannenbaum.  (R. 25-41.)  Plaintiff again appeared without a lawyer.  (R. 27.)  The ALJ stated

that he would assist plaintiff to the extent reasonably possible.  (*Id.*)  The ALJ received

documentary evidence on the case and heard testimony from both plaintiff and Dr. Edward N.

Halprin, a board certified psychiatrist who provided medical expert testimony.  (R. 25-41.)

Plaintiff testified as to her living situation, her alleged disabilities, and the impact of those

alleged disabilities on her daily life.  (*Id.*)

       In a written decision dated November 7, 2011, ALJ Tannenbaum denied

plaintiff's claims for benefits.  (R. 6-20.)  Applying the agency's sequential five-step test for

determining whether an individual is disabled (*see* R. 10-17.), the ALJ concluded that plaintiff

was not disabled under sections 216(i), 223(d), and 1614(a)(3)(A) of the Act.  (R. 17.)  He found

that plaintiff had not engaged in substantial gainful activity since the alleged onset date of the

disabilities, and she suffered primarily from a "very mild" form of asthma and "a form of

---

[1] Citations to "(R. __.)" refer to the certified copy of the administrative record of proceedings filed by the
Commissioner as part of her answer.

depressive disorder vs. a bipolar disorder." (R. 11-12.) He concluded that "[i]n activities of daily living, the claimant has no more than a mild restriction" and that "in social functioning, the claimant also has only mild difficulties." (*Id.*) Furthermore, plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. (R. 12.) The ALJ further concluded that plaintiff had the residual functioning capacity ("RFC") to perform a full range of work at all exertional levels, with only nonexertional limitations on "high stress work." (R. 13.) He concluded that plaintiff was capable of performing past relevant work as a cashier and a sales clerk. (R. 17.) In sum, ALJ Tannenbaum stated, "In comparing the claimant's residual functioning capacity with the physical and mental demands of this work, the undersigned finds that the claimant is able to perform it as actually and generally performed." (*Id.*)

Following the ALJ's decision, plaintiff requested review of the decision by the SSA Appeals Council ("AC"). (R. 21.) The AC denied plaintiff's request for review in a letter dated April 26, 2013, and ALJ Tannenbaum's decision thus became the final decision of the Commissioner. (R. 1.)

Plaintiff filed a timely action in this Court seeking review of the Commissioner's final decision. Both parties moved for judgment on the pleadings pursuant to Rule 12(c), Fed. R. Civ. P.

## II.    EVIDENCE BEFORE THE ALJ

### a.  *Plaintiff's Background and Hearing Testimony*

Plaintiff was born on January 1, 1978, and was 33 years old at the time of the 2011 ALJ hearing. (R. 28-29.) Plaintiff resided in a Bronx, apartment, where she had been living for approximately 13 years. (R. 28.) She was then single and living with her three

children, aged 17, 15, and six.  (*Id.*)  Plaintiff testified to completing an 8th grade education and being able to read and write.  (*Id.*)  She is able to speak both English and Spanish.  (R. 403.)

At the hearing, plaintiff gave the following as the reason why she could not work after October 2008: "[i]t was a, a very bad relationship breakup, it was through domestic violence."  (R. 32.)  Before 2008, when the alleged disabilities surfaced, plaintiff testified that she worked as a pawn broker "assisting" loans for approximately ten months, and as a data entry clerk for approximately seven years.  (R. 30-31.)  When asked whether she had attempted to find employment, she responded "they told me not to attempt to look for a job until my fair hearing is complete."  (R. 36-37.)  She also testified that she started seeing a psychotherapist and a regular therapist "a couple of months after" she stopped working at the instruction of her family's primary doctor.  (R. 32-33.)  She would visit the psychotherapist once a month and the regular therapist once a week.  (R. 33-34.)  Finally, plaintiff testified that both she and her psychotherapist, Dr. Frenkel, were satisfied with her progress and effects of the medication prescribed.  (*Id.*)

### b.  Medical Records

The "Mott Haven Pharmacy" records show that plaintiff was prescribed several medications by psychotherapist Dr. Richard Frenkel.  (R. 616-19.)  Notably, these medications included Abilify, Hydroxyzine, Trazadone, and Lexapro.  (*Id.*)

A FEGSBiopsychosocial Summary Report ("BPS Report"), [2] dated September 1, 2009, reported that plaintiff had recently been diagnosed with bipolar disorder with a component of major depressive disorder.  (R. 396.)  The report does not state who rendered such a diagnosis.

---

[2] FEGS Health & Human Services (formerly Federation Employment & Guidance Service) is a provider of health care and other services in the New York area.

(*Id.*)  Under the headings, no "Work Limitations" or "Medical Conditions Impacting Employment" listed in this report.  (R. 394-96.)

In a FEGS BPS Report, dated September 9, 2009 (R. 397-410), plaintiff reported a history of domestic violence.  (R. 405.)  She also reported feeling "down, depressed, or hopeless" several times in the previous two weeks.  (R. 408.)  Her depression level was listed as "Severe."  (*Id.*)  Also, it was "very difficult" for her to work or take care of things at home.  (*Id.*)  Plaintiff also reported that she had the ability to travel independently, but with limitations due to the side effects of her mental health medications and anxiety.  (R. 409.)  In addition, the report lists plaintiff's psychological barriers to employment as her mental health conditions that "significantly affect functioning."  (R. 410.)  Plaintiff reported that she had bipolar disorder and that she was seeing a psychiatrist and a therapist.  (R. 410.)  Plaintiff also reported that she was then currently prescribed the following medications: Abilify 30mg, Hydroxyzine 10mg, Trazadone 50mg, and Lexapro 20mg.  (R. 410.)  The ultimate conclusion of the report was that plaintiff needed further assessment.  (*Id.*)

Plaintiff visited Herb Meadow, M.D., a psychiatrist, on September 18, 2009.  (R. 411-14.)  Plaintiff's medical history stated that she had never been hospitalized for medical reasons, and had no current or chronic medical condition.  (R. 411.)  Plaintiff also reported that she was seeing Dr. Franco once per month for psychological treatment, and that she was depressed and had been diagnosed with bipolar disorder.  (*Id.*)  She reported predominantly depressed moods, conditions such as diminished self-esteem and difficulty concentrating, and excessive anxiety at times.  (R. 411-12.)  The ultimate diagnosis was depressive disorder NOS ("Not Otherwise Specified").  (R. 413.)  Under Axis I, Dr. Meadow wrote "[r]ule out bipolar disorder" (R. 413), which this court takes to mean that Dr. Meadow could not exclude the

possibility of bipolar disorder but was not then able to render such a diagnosis. Dr. Meadow recommended continuing with psychological treatment. (R. 413.) Dr. Meadow concluded that plaintiff could handle most tasks associated with following a schedule and instructions, and any impairment "[did] not appear to be significant enough to interfere with the claimant's ability to function on a daily basis." (*Id.*)

The "Psychiatric Review Technique," completed by Dr. E. Karmin, dated October 5, 2009, noted that plaintiff had an affective disorder. (R. 458.) The report made no mention of a retardation issue or a functional limitation. (R. 458, 468.)

Plaintiff then visited Mr. Vic Chaperon, a Licensed Clinical Social Worker in Psychotherapy ("LCSWR"), on January 12, 2010. (R. 451-52.) Mr. Chaperon diagnosed plaintiff with major depression NOS and, like Dr. Meadow, made the notation, "R/O [rule out] bipolar disorder," meaning that a diagnosis of bipolar disorder should be considered. (R. 451.) In addition, he determined that plaintiff was "incapable of working at this time" because "her mood would greatly hinder her performance." (R. 452.)

A BPS Report, dated January 22, 2010 (R. 415-57) notes plaintiff's medical history as bipolar and severe depression. (R. 430.) The report states that plaintiff was not able to work due to her recent diagnosis of bipolar disorder. (R. 436.) Also, plaintiff's conditions required treatment before a functional capacity outcome could be made. (*Id.*) The report listed both depression and anxiety as its emotional/psychiatric "findings." (R. 448.) Elsewhere, the report stated that plaintiff had medical and/or mental health conditions that significantly affect functioning." (R. 440, 442.)

Hospital records from Morris Heights Health Center ("MHHC"), cover the period from May 12, 2009 to February 7, 2011 and are largely unrelated to any depressive or bipolar

diagnosis.  (R. 472-583.)  The records relate to other medical conditions not directly relevant to this appeal.  (*Id.*)  However, there is a diagnosis of bipolar II disorder as an "Active Problem" by Mr. Chaperon, the LCSWR.  (R. 484.)

Plaintiff was examined again by Mr. Chaperon on February 17, 2011.  (R. 584-593.)  In his March 7, 2011report, LCSWR Chaperon diagnosed plaintiff with bipolar II disorder.  (R. 585.)  In addition, he reported that plaintiff could sit for up to seven hours, and stand and walk up to six hours, within an eight hour work day.  (R. 586.)  He also concluded that plaintiff could perform such physical activities as sorting or handling files, climbing a few steps at a reasonable pace with the use of a single hand rail, and using standard public transportation without assistance.  (*See* R. 590.)

Plaintiff visited Dr. William Lathan on February 25, 2011.  (R. 594-603.)  Dr. Lathan determined that plaintiff could occasionally lift or carry up to 10 pounds.  (R. 597.)  He reported that plaintiff could sit for up to five hours, stand up to two hours, and walk up tone hour within an eight hour work day.  (R. 598.)  Plaintiff could also handle the noise of an office environment.  (R. 601.)  As was determined in plaintiff's visit with LCSWR Chaperon, plaintiff could perform such physical activities such as sorting or handling files, climbing a few steps at a reasonable pace with the use of a single hand rail, and using standard public transportation without assistance.  (*See* R. 602.)

Plaintiff also visited Edward Hoffman, Ph.D. on that February 25.  (R. 604-615.)  Dr. Hoffman's "Medical Source Statement," a check-the-box form, stated that, vocationally, plaintiff could perform simple repetitive tasks.  (R. 606.)  Ms. Miranda was administered a Weschler Adult Intelligence Scale (4th Edition) and was found to have a full scale I.Q. of 65

which Dr. Hoffman characterized as mild mental retardation.  (R. 609, 610)  In addition, her mood was listed as anxious, but stable.  (R. 605.)

### c.  Medical Expert Testimony

Edward N. Halprin, M.D., a board certified psychiatrist, provided expert medical testimony at the ALJ hearing.  (R. 37-39, 40-41.)  First, the ALJ confirmed that Dr. Halprin had reviewed all the pertinent medical evidence "that would detail the nature and extent of this claimant's major disability."  (R. 37-38.)  Dr. Halprin gleaned from the record that plaintiff suffers from a depression that would be seen as a major depressive disorder, mild to moderate.  (R. 38; *see also* Exhibit 5F at R. 415-57.)  He also testified that plaintiff's condition did not meet the criteria for bipolar disorder.  (*Id.*)  Further, he saw no evidence of psychosis in the material. (*Id.*)  He pointed to two consultative exams, one performed by Dr. Meadow, in which there was a diagnosis of depressive disorder, a notation of rule out bipolar disorder, and no other diagnosis. (*Id.*)  He also noted that Dr. Meadow stated that plaintiff was able to understand simple instructions and directions, along with performing simple tasks, independently.  (*Id.*)

Dr. Halprin noted that the mental status recorded by Dr. Hoffman was essentially the same as the two consultative exams, but he disagreed with the determination of Dr. Hoffman that plaintiff was mildly mentally retarded.  (R. 38; *see also* Exhibit 10F at R. 604-15.) Specifically, Dr. Halprin testified that although plaintiff may have had a learning disability in the past and has an eighth grade education, she can read and write, which he viewed as indicative of average intelligence.  (*Id.*)  He noted plaintiff's ability to learn new tasks and follow a routine schedule with supervision.  (R. 39.)

Upon reexamination later in the hearing, Dr. Halprin noted that he thought plaintiff seemed as though she was capable of working.  (R. 40.)  In addition, he testified that he

was not of the opinion that plaintiff exhibited any impairment that would meet or equal a listed

disability that the Social Security Administration lists to determine if a claimant is presumptively

disabled.  (*Id.*)

## III.    APPLICABLE LAW

### a.  *Standard of Review*

Under Rule 12(c), Fed.R.Civ.P., a movant is entitled to judgment on the pleadings

only if he or she establishes that, based on the pleadings, he or she is entitled to judgment as a

matter of law.  *Burns Int'l Sec. Servs., Inc. v. Int'l Union, United Plant Guard Workers of Am.

(UPGWA) & Its Local 537*, 47 F.3d 14, 16 (2d Cir. 1995).  "Judgment on the pleadings is

appropriate where material facts are undisputed and where a judgment on the merits is possibly

merely by considering the contents of the pleadings."  *Sellers v. M.C. Floor Crafters, Inc.*, 842

F.2d 639, 642 (2d Cir. 1988).

Review of the Commissioner's final decision denying disability benefits is

limited.  A court may not review the Commissioner's decision *de novo*.  *See Cage v. Comm'r of

Soc. Servs .*, 692 F.3d 118, 122 (2d Cir. 2012) (citation omitted); *see also Halloran v. Barnhart*,

362 F.3d 28, 31 (2d Cir. 2004) (per curiam).  If the Commissioner's findings are free of legal

error and supported by substantial evidence, the court must uphold the decision.  42 U.S.C. § 405

(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by

substantial evidence, shall be conclusive, and where a claim has been denied ... the court shall

review only the question of conformity with [the] regulations . . . .").

A court's review thus involves two levels of inquiry.  *Tejada v. Apfel*, 167 F.3d

770, 773 (2d Cir. 1999).  First, the court must review "whether the Commissioner applied the

correct legal standard," *id.,* including adherence to applicable regulations.  *See Kohler*, 546 F.3d

at 265; *see also Marquez*, No. 12 Civ. 6819, 2013 WL 5568718 at *7.  Second, the court must decide whether the Commissioner's decision is supported by substantial evidence.  *Tejada*, 167 F.3d at 773.

Substantial evidence means "more than a mere scintilla.  *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citation and quotation marks omitted).  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Id.*  The substantial evidence test applies to inferences drawn from basic evidentiary facts, as a reviewing court "is required to examine the entire record, including ... evidence from which conflicting inferences can be drawn."  *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012).  "Where the Commissioner's decision rests on adequate findings supported by evidence having rational probative force, [the court] will not substitute [its] judgment for that of the Commissioner."  *Veino v. Barnhart*, 312 F.3d 578, 586 (2d Cir. 2002).

The reviewing court views the evidence as a whole rather than considering evidence in isolation.  *See Talavera*, 697 F.3d at 151 (stating that the reviewing court is required to examine the entire record); *see also Alston v. Sullivan*, 904 F.2d 122, 126 (2d Cir. 1990).  Even if there is substantial evidence weighing against the Commissioner's position, the Commissioner's determination will not be disturbed so long as substantial evidence also supports it.  *See DeChirico v. Callahan*, 134 F.3d 1177, 1182 (2d Cir. 1998) (upholding the Commissioner's decision where there was substantial evidence for both sides).

It is the function of the Commissioner, not the reviewing court, to resolve evidentiary conflicts and to appraise the credibility of witnesses, including claimant.  *Carroll v. Sec'y of Health and Human Servs.*, 705 F.2d 638, 642 (2d Cir. 1983).  "[G]enuine conflicts in the medical evidence are for the Commissioner to resolve."  *Burgess v. Astrue*, 537 F.3d 117, 128

(2d Cir. 2008) (citation omitted).  In particular, courts must show special deference to an ALJ's credibility determinations because the ALJ had the opportunity to observe plaintiff's demeanor while testifying.  *Yellow Freight Sys. Inc. v. Reich*, 38 F.3d 76, 81 (2d Cir. 1994); *see also Snell v. Apfel*, 177 F.3d 128, 135 (2d Cir. 1999).

Finally, "[b]ecause a hearing on disability benefits is a non-adversarial proceeding, the ALJ generally has an affirmative obligation to develop the administrative record," regardless of whether the claimant is represented by counsel.  *Perez v. Chater*, 77 F.3d 41, 47 (2d Cir. 1996).  The Court must be satisfied that the claimant received a full hearing "in accordance with the beneficent purposes of the Act."  *Cruz v. Sullivan*, 912 F.2d 8, 11 (2d Cir. 1990).  To this end, "the reviewing court must make a 'searching investigation' of the record to ensure that" the ALJ protected the claimant's rights.  *Robinson v. Sec'y of Health and Human Servs.*, 733 F.2d 255, 258 (2d Cir. 1984) (citation omitted).

### b. *Five-Step Disability Determination*

The Act defines "disability" in relevant part as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C. § 1382c(a)(3)(A).  The Act provides that "[a]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for

work."  42 U.S.C. § 423(d)(2)(A); *see also* 42 U.S.C. § 1382c(a)(3)(B).  Work which exists in

the national economy "means work which exists in significant numbers either in the region

where such individual lives or in several regions of the country."  42 U.S.C. § 423(d)(2)(A); *see*

*also* 42 U.S.C. § 1382c(a)(3)(B).

    The Commissioner's determination of a claimant's disability follows a five-step

sequential analysis promulgated by the Social Security Administration (the "SSA").  20 C.F.R.

§§ 404.1520, 416.920.  The Second Circuit has summarized this analysis as follows:

> First, the [Commissioner] considers whether the claimant is
> currently engaged in substantial gainful activity. If he is not, the
> [Commissioner] considers whether the claimant has a "severe
> impairment" which significantly limits his physical or mental ability
> to do basic work activities. If the claimant suffers such an
> impairment, the third inquiry is whether, based solely on medical
> evidence, the claimant has an impairment which is listed in
> Appendix 1 of the regulations. If the claimant has such an
> impairment, the [Commissioner] will consider him disabled without
> considering vocational factors such as age, education, and work
> experience.... Assuming the claimant does not have a listed
> impairment, the fourth inquiry is whether, despite the claimant's
> severe impairment, he has the residual functional capacity to
> perform his past work. Finally, if the claimant is unable to perform
> his past work, the [Commissioner] then determines whether there is
> other work which the claimant could perform.

*Rosa v. Callahan*, 168 F.3d 72, 77 (2d Cir. 1999) (citation and quotation marks omitted; brackets

and omission in original).  The claimant bears the burden of proof for the first four steps; the

burden shifts to the Commissioner at the fifth step.  *See Selian v. Astrue*, 708 F.3d 409, 418 (2d

Cir. 2013); *see also Burgess*, 537 F.3d at 128.

>    In making his determination by this process, the
> Commissioner must consider four factors: (1) the objective medical
> facts; (2) diagnoses or medical opinions based on such facts; (3)
> subjective evidence of pain or disability testified to by the claimant
> or others; and (4) the claimant's educational background, age, and
> work experience.

*Brown v. Apfel*, 174 F.3d 59, 62 (2d Cir. 1999) (per curiam) (citation and quotation marks omitted).  Further, the Commissioner "shall consider the combined effect of all the individual's impairments . . . ."  42 U.S.C. §§ 423(d)(2)(B), 1382c(a)(3)(G).

### c.   *Treating-Physician Rule*

Under applicable regulations, the opinion of a claimant's treating physician regarding "the nature and severity of [claimant's] impairment[s]" will be given "controlling weight" if it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record."  20 C.F.R. §§ 404 .1527(c)(2), 416.927(c)(2); *see Burgess*, 537 F.3d at 128 (citations omitted).  In contrast, a treating physician's opinion is not afforded controlling weight when the opinion is inconsistent with other substantial evidence in the record, such as the opinions of other medical experts.  20 C.F.R. § 404.1527(d)(2); *Snell*, 177 F.3d at 133.  In such a case, a report from a consultative physician may constitute substantial evidence.  *Mongeur v. Heckler*, 722 F.2d 1033, 1039 (2d Cir. 1983).  If the ALJ gives the treating physician's opinion less than controlling weight, he must provide good reasons for doing so.  *Clark v. Comm'r of Soc. Sec.*, 143 F.3d 115, 118 (2d Cir. 1998).

If not afforded controlling weight, a treating physician's opinion is given weight according to a non-exhaustive list of enumerated factors, including (i) the frequency of examinations and the length, nature, and extent of the treatment relationship; (ii) the evidence in support of the physician's opinion; (iii) the opinion's consistency with the record as a whole; and (iv) whether the physician has a relevant specialty.  20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *see also Clark,* 143 F.3d at 118.

Finally, the opinion of a treating physician, or any doctor, that the claimant is "disabled" or "unable to work" is not controlling. 20 C.F.R. §§ 404.1527(d)(1), 416.927(d)(1).

**d.   Subjective Claims of a Claimant**

The subjective experience of physical or mental pain may constitute a disability if it derives from a physical or mental impairment and is so severe "as to preclude any substantial gainful employment." *Dumas v. Schweiker*, 712 F.2d 1545, 1552 (2d Cir. 1983); *see also Gallagher on Behalf of Gallagher v. Schweiker*, 697 F.2d 82, 84 (2d Cir. 1983); 20 C.F.R. §§ 404.1529, 416.929.  Subjective complaints alone, however, are not "conclusive evidence" that a person is disabled, and the ALJ may evaluate the credibility of a plaintiff who claims to experience pain.  *See Snell*, 177 F.3d at 135; *see also* 42 U.S.C. § 423(d)(5)(A).  A claimant who alleges a disability based on the subjective experience of pain need not adduce direct medical evidence confirming the extent of the pain, but the applicable regulations do require "medical signs and laboratory findings which show that [the claimant has] a medical impairment(s) which could reasonably be expected to produce the pain." *See Snell,* 177 F.3d at 135; *see also* 20 C.F.R. § 404.1529(a).

**IV.    DISCUSSION**

**a.   ALJ's Decision**

Applying the sequential five-step process for evaluating disability claims, the ALJ found plaintiff not disabled within the meaning of the Act and thus denied her benefit claims. (R. 10-17.)  First, the ALJ determined that plaintiff had not engaged in substantial employment since October 15, 2008, the alleged onset date of the impairment.  (R. 11; *see also* §§ 20 CFR 404.1571 *et seq.*, 416.971 *et seq.*)  This was consistent with plaintiff's testimony, as she maintained that she had not worked in the interim years between October of 2008 and the ALJ

hearing and that she passed the time primarily by both watching television and reading books at home.  (R. 30, 36.)

At the second step of the analysis, the ALJ determined that plaintiff had some severe physical and mental impairments pursuant to 20 CFR §§ 404.1520(c) and 416.920(c), primarily mild asthma by history and a "depressive disorder vs. a bipolar disorder."  (R. 12.)

Third, the ALJ determined that plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (R. 12.)

Fourth, the ALJ determined that plaintiff, in light of her RFC, was able to perform a full range of work at all exertional levels, with only nonexertional limitations.  (R. 13.)

Finally, the ALJ determined that plaintiff was still able to perform past relevant work as a cashier and as a sales clerk.  (R. 17.)  Further, he found that this work did not require the performance of work-related activities precluded by plaintiff's RFC.  (R. 17; *See also* 20 C.F.R. §§ 404.1565 and 416.965.)  The ALJ found that plaintiff could perform this work as it was actually and generally performed.  (R. 17.)

**b.  The ALJ's Fact Finding Was Flawed**

As will be explained, the ALJ's finding at step two as to the nature of Ms. Miranda impairment or combination of impairments and whether those impairments were "severe" was not supported by substantial evidence.  Further, at step three, the ALJ's  finding that Ms. Miranda did not have an impairment or combination of impairments that equaled or exceeded a listed impairment was not supported by substantial evidence.

At step two, the ALJ found that that "[t]he claimant has the severe physical and mental impairments, primarily asthma by history, although very mild, and a depressive disorder

vs. a bipolar disorder. . . ."  (R. 12)   The most plausible interpretation is that the ALJ found that

the claimant had a depressive disorder but did not find that she had bipolar disorder.  However,

the record supports and the ALJ notes that a FEGS report of August 2009, less than a year after

the claimed onset date, "indicates a recent diagnosis of 'bipolar disorder with a component of

severe depression' in treatment for approximately four weeks at this [sic] time, as well as a

diagnosis of migraine, one month earlier."  (R. 13.)  The ALJ noted that she was prescribed

Abilify, Trazadone, Lexapro and Hydrozxine.  (R 14)  True, Dr. Halpern, a medical consultant,

opined that Ms. Miranda did not meet the diagnostic criteria for bipolar disorder, but his

conclusory opinion, without treatment or examination of the claimant, was not questioned in any

way.  He testified that he saw no indication of psychosis in the medical records. Notably, a

review of the DSM-IV for does not list the presence of "psychosis" as required for a diagnosis of

Bipolar Episode and Bipolar Disorder.  Dr. Halpern may have had a simple and straightforward

explanation for his rejection of the diagnosis but it was not developed in the two pages of his

testimony.  It does not appear that the ALJ had in the record the medical records that supported

the statement in the FEGS report of August 2009 that Ms. Miranda had been diagnosed with

bipolar disorder.  In this regard, the ALJ did not adequately develop the record.  Because the fact

finding at step two was not supported by substantial evidence, the balance of the fact finding was

infected.

        At step three, the ALJ was required to determine whether Ms. Miranda had an

impairment or combination of impairments that equaled or exceeded a listed impairment in 20

C.F.R. Part 404, Subpart P, Appendix 1.  Section 12.00 et seq. lists mental impairments and,

specifically at 12.05, intellectual disabilities.   As noted Dr. Hoffman, a psychologist, conducted

a consultative examination and found that plaintiff had a full scale I.Q. of 65.  (R609.)   In the

case of an I.Q. between 60 and 70, to qualify as an intellectual disability, there must also be "a physical or other mental impairment imposing an additional and significant work-related limitation of function" (12.05(C)) or one of the following: " 1. Marked restriction of activities of daily living; or 2. Marked difficulties in maintaining social functioning; or 3. Marked difficulties in maintaining concentration, persistence, or pace; or 4. Repeated episodes of decompensation, each of extended duration."  (12.05(D)).

The ALJ accorded Dr. Hoffman's finding "no weight" because in his view "there was no evidence in the record consistent with such mental retardation or any similar condition, nor has any been alleged by the complainant." (R. 16)  In the face of a full scale I.Q. test (Wechsler Adult Intelligence Scale (4th Edition)), administered by a psychologist, and of relatively recent vintage (February 25, 2011), the ALJ should not have placed such emphasis on the claimant's failure to claim mild retardation and there was an inadequate basis in the record to reject Dr. Hoffman's test report.

Dr. Hoffman did note that Ms. Miranda "does cooking, laundry, and shopping independently."  (R. 609)  She "can perform simple repetitive tasks," "can relate adequately to others in structured situations," "can learn new rote tasks" and "can follow a routine and schedule with supervision." (R. 610.)  But, as noted, I.Q in the range of 60 and 70 does not amount to a disability.  A person in this I.Q. range presumably can maintain employment and, for this reason, the regulations requires a plus factor beyond an I.Q. in this range to qualify as a listed impairment.

The testimony at the hearing did not give the ALJ an adequate basis to reject the results of the I.Q. test.   Ms. Miranda testified that she attended school until the eighth grade. The ALJ then asked "you can read and write, is that a fair statement?  To which she responded

- 17 -

with a simple "Yes. " (R. 29). When asked about her prior work, she testified that "I was a data entry" [sic] and also testified that she had been a "pawn broker" (R. 31). No follow up questions were asked as to the nature of the tasks involved in this work. Dr. Halpin, a psychiatrist who testified as an expert and never examined Ms. Miranda, based his rejection of a diagnosis of mild retardation principally on her testimony that she worked "as a data entry" and a "pawn broker" and the fact that she could read and write to some unspecified extent. (R. 39.) Because the diagnosis of a mild retardation was rejected without adequate support in the record, the ALJ did not consider whether a plus factor (12.05(C) & (D)) was present. Thus, the fact finding at step three was not supported by substantial evidence.

CONCLUSION

It may be that if the record had been more fully developed and the findings better explained, the result reached by the ALJ would be found to be supported by substantial evidence. But on this record, the Court cannot conclude that the findings are supported by substantial evidence. The decision of the Commissioner is REVERSED and REMANDED to the Commissioner for further proceedings consistent herewith.

SO ORDERED.

P. Kevin Castel
United States District Judge

Dated: New York, New York
November 5, 2014

- 18 -